WATKINS, Judge.
This is an action brought by appellees, JTS Realty Corporation, Oak Manor Motor Hotel, Inc. and Talmar, Inc., to have declared null and void an ordinance enacted by the Metropolitan Council (Council) for the City of Baton Rouge, Parish of East Baton Rouge authorizing the lease of certain land lying between the Centroplex and Government Street[1] to the Riverfront Cen-troplex Development Group (Riverfront) for construction of the “Twin Towers” Project, which would entail a hotel and office building, and additional parking facilities.
The trial court held the contracts null and void after both sides moved for summary judgment. We affirm.
The facts of the case are clearly set forth in the Written Reasons for Judgment of the trial court from which we quote in pertinent part:
On February 27, 1985, the Metropolitan Council (hereinafter Council) adopted Resolution 23581 authorizing the Division of Community and Economic Development with the cooperation of the City-Parish purchasing agent to prepare and publish a “Request for Proposals” soliciting development proposals for the area comprising the parking facilities of the Baton Rouge Riverfront Centroplex.
In response to the “request for proposals” authorized by Resolution 23932, the Division of Community and Economic Development received four (4) proposals. The proposals were made by (1) The Riverfront Centroplex Development Group, (2) Perez Limited, (3) Mr. Joseph T. Spi-nosa, President of JTS Group, and (4) a joint proposal by A.P. Keller and Milton Womack.
On May 22, 1985, Al Gensler recommended to the Metropolitan Council and the Mayor-President Committee that the City of Baton Rouge and the Parish of East Baton Rouge (“City-Parish”) enter into negotiations for a lease and development agreement of the area described in the “request for proposals” with the Riverfront Centroplex Development Group.
On May 29, 1985, the Council adopted Resolution 23932 which authorized the Community Development official to conduct negotiations for a lease and development agreement for the Riverside Cen-troplex Development project. The resolution also required that the terms and conditions of the agreement were to be submitted to the Council for approval.
As a result of the negotiations, a set of six (6) documents were produced: (1) A Lease and Development Agreement; (2) A Lease of Office Space; (3) A Cogenera-tions Service Agreement for the Sales of Electrical and Thermal Energy; (4) An Energy Services Agreement; (5) A Management Agreement; Operating Agreement and General Terms and Conditions for the parking concessions at the Baton Rouge East and West Parking garages; and (6) A Management Agreement: for Management of the Centro-plex Arena, Exhibition Hall and Performing Arts Center.
Copies of the original six documents were on file with the Council administrator for public inspection two weeks prior to the February 12, 1986 Council Meeting.
On January 22, 1986, the Council was told that the proposed Ordinance 8101 would be considered February 23, 1986. Notice of Intent on the proposed ordinance was published in the State Times on January 28, February 4 and February 11, 1986.
*277 On February 12, 1986, the Council adopted Ordinance 8101 which authorized the Mayor-President to execute the original documents submitted by The Riverfront Development Corporation as modified by the Council. On March 6, 1986, the final adopted Ordinance 8101 was published in the State Times. The Council adopted Resolution 24953 on March 12, 1986, delayed execution of the documents until further notice and created a study committee designed to study the original documents. In addition, the National Development Council was hired to evaluate the City-Parish’s position in the project and to report to the study committee. The committee on April 8, 1986, recommended approval of all of the original documents as modified except the Management agreement for management of the Centroplex and Performing Arts Buildings.
On April 9, 1986, Resolution 25045 was adopted giving the Mayor-President the authority once again to execute the documents as amended by the Council.
On April 15, 1986, Mayor Screen signed the recommended documents. In all, five documents were signed. All of the original documents except the Management Agreement for the Centro-plex and Performing Arts buildings were signed. The executed documents were never placed in the Council Administrator’s office for public inspection after their final modification by the Council prior to their signing by the Mayor-President on April 15, 1986.
The issues brought before us on appeal are:
1. Is the agreement set forth in the contracts or documents entered into by the City-Parish with Riverfront Centroplex Development Group an “industrial inducement” contract within the contemplation of LSA-R.S. 33:4717.1 and 33:4717.2?
2. Does LSA-R.S. 33:4717.1 apply as well as 33:4717.2?
3. Is it necessary that the public bid laws (LSA-R.S. 38:2212) and public lease laws (LSA-R.S. 41:1211 et seq.) be complied with?
4.Was LSA-R.S. 33:4717.2 in fact complied with?
1.
The agreement entered into between Riverfront and the City-Parish was set forth in five separate contractual documents, viz.: (1) A Lease and Development Agreement; (2) A Lease of Office Space; (3) A Co-Generation Service Agreement for the Sale of Electrical and Thermal Energy; (4) An Energy Services Agreement; and (5) A Management Agreement-Operating Agreement and General Terms and Conditions for the Parking Concessions at the Baton Rouge East and West Parking Garages.
The trial court found that the principal contract, the Lease and Development Agreement, did constitute an industrial inducement contract under the authority of LSA-R.S. 33:4717.1 and R.S. 33:4717.2, but that the ancillary contracts were not industrial inducement in nature. The effect of the trial court’s finding that the contracts other than the Lease and Development Agreement were not integral parts of an industrial inducement project was to find the Public Bid and Lease Laws were applicable.
On the question of whether there was a single contract or there were five separate contracts, we note the contracts or agreements between the City-Parish and Riverfront all have one central purpose, the leasing of land by the City-Parish for the construction of an office-hotel complex.
That both the City-Parish and Riverside considered their agreement to be one integrated contract is evident from the statement of purpose contained in the preamble to the Lease and Development Agreement which reads as follows:
The purpose of this agreement is to effectuate the disposition and development of the Project Site as hereinafter described for an office-hotel development and to enter into Ancillary Contracts providing for services pertaining to (1) East and West Parking Garages, (2) the Cen *278 tral Mechanical Plant and (3) to lease certain office space from Developer. The development of the Project Site and execution of the Ancillary Contracts pursuant to this Agreement is in the best interests of the CITY-PARISH and of its residents, and in accordance with public purposes and provisions of applicable federal, state and local laws and requirements. This Agreement is entered into for the purpose of development and not for speculation in land holding. Subject to the mutual promises and the terms and conditions set forth in this Agreement and for good and valuable consideration the CITY-PARISH agrees to Lease the Project Site to the Developer and to execute the Ancillary Contracts.
Although the major contract as we have seen is called the Lease and Development Agreement, and the other contracts ancillary contracts, the agreements that are before us are all separate facets of a single whole, as each contract constitutes part of the cause or consideration for each other contract. That being the case, we hold the separate contracts to constitute one single contract or agreement, each by its very terms dependent on the existence of the others.
We must consider the contract to be an industrial inducement contract as the object of the contract is to aid the hotel industry, promote employment, promote the tourist industry, and in general stimulate the economic development of downtown Baton Rouge. We note that another portion of the Revised Statutes, LSA-R.S. 51:1253(9) defines “Tourism Industry”. Thus, tourism, hotel management, and the like are considered industries by the very terms of the Revised Statutes. Therefore, we view as devoid of merit the contention of plaintiffs that the basic contract or the contracts ancillary thereto are not an industrial inducement contract.
2.
The trial court held that both LSA-R.S. 33:4717.1 and R.S. 33:4717.2 must have been complied with, and since the parties had stipulated that the provisions of Section 4717.1 had not been complied with, the contracts were null and void. To determine whether or not LSA-R.S. 33:4717.1 and 33:4717.2 both apply, we quote the two statutes in their entirety, which we do by footnote.[2] The ordinance passed by a 7-5 *279 majority. LSA-R.S. 33:4717.1 requires approval by a ⅜ vote, while LSA-R.S. 33:4717.2 requires that a contract entered into under its provisions be approved by *280 majority vote. Thus, if both statutes apply, the contract fails.
In 1968 the legislature enacted R.S. 33:4717.1 which authorized only parishes (not municipalities or other political subdivisions) to set aside real estate for industrial inducement purposes by two-thirds vote of the parish governing authority. In 1978 the legislature enacted R.S. 33:4717.2 which authorized “any parish, municipality, industrial district, port, harbor and terminal district, or other political subdivision of the state” to transfer any property it owned for industrial inducement purposes. Section 4717.2 grants authority, quoting from that statute, “... in addition to authority quoted by other laws, It thus appears that Section 4717.2 provides another method of transferring property for industrial inducement purposes different from that provided in Section 4717.1, and that this latter section is rendered inapplicable by the very provisions of Section 4717.2. While Section 4717.1 requires a ⅜ vote of the parish governing authority, Section 4717.2 requires only a majority vote of the appropriate governing authority but provides certain detailed procedural safeguards which must be complied with prior to any transfer. These safeguards furnish broad protection to the public from whatever abuse of governmental discretion might result from the requirement of only a majority vote under this Section. We find, therefore, a reasonable basis for the legislature to have enacted this alternative method of transferring property for industrial inducement purposes. Thus, the City-Parish was not required to comply with the provisions of both Section 4717.1 and 4717.2 as was held by the trial court.
3.
Appellees contend the public bid laws were not complied with. However, if express statutory and constitutional authority indicates that the public bid laws should not be applied, or if the contract is too complex to be the object of bidding, the contract is not void for failure to apply the public bid laws. Arnold, v. Board of Levee Commissioners of Orleans Levee District, 327 So.2d 495 (La.App. 4th Cir.1976). In the present case the proposal solicited by the City-Parish from the public was far too complex to be the object of the public bid laws. Furthermore, express statutory authority in the form of the language quoted above “... in addition to authority granted by other laws ...” is found to render the public bid laws inapplicable. Thus, the public bid law LSA-R.S. 38:2212 and the public lease law, LSA-R.S. 41:1211 et seq., are inapplicable to the present contract.
4.
However, we must view the contracts as being fatally flawed in one respect. The industrial inducement statute under which we hold the City-Parish properly sought to proceed, LSA-R.S. 33:4717.2 A and B, requires that the proposed contract be placed before the public for public inspection for a period of two weeks before an ordinance is adopted granting the contract. In the present case, the contract was altered in many material points, not entirely to the advantage of the City-Parish, between the time the contract was placed for public inspection and the time the contract was finally approved. Although a few minor changes may be permissible, we find that a multitude of major and minor changes was not within the contemplation of the statute. The right to public inspection, for which the statute provides, would be meaningless if the body adopting the ordinance were free to substantively change the proposed contract after it was left open to public scrutiny. Thus, on this limited ground, we hold the contract null and void.
Accordingly, the judgment of the trial court is affirmed, costs in the sum of $1,513.39 to be borne by the City-Parish.
AFFIRMED.

. The land is presently the area parking lot for the Baton Rouge Riverside Centroplex.

. LSA-R.S. 33:4717.1 reads as follows:
Wherever, in the opinion of the governing authority of any parish, any real property owned by such parish, including land, streets, sidewalks, buildings, or any other property, dedicated to public use, shall no longer be needed or necessary for the public use to which it was originally destined or dedicated, the governing authority of such parish shall have the power and authority, upon a two-thirds vote of the members thereof, to revoke the destination or dedication of such property, and may thereafter utilize such property for industrial inducement purposes. Whenever the governing authority of such parish shall have created an industrial development board as authorized by R.S. 51:1151, et seq., the police jury may contract with such development board for the administration, improvement, and development of said industrial area, and upon the adoption of an ordinance by such two-thirds vote, the governing authority, through its duly authorized officer, shall have the power to convey title to such property to said industrial development board for such consideration as it shall deem advisable, and for such purposes the said industrial development board is hereby declared to be a special district within the intent and meaning of R.S. 33:1321 et seq., and the ownership, operation and administration of said industrial area by said police jury and industrial development board are hereby declared to be public and governmental functions, exercised for a public purpose and as a matter of public necessity.
LSA-R.S. 33:4717.2 reads as follows:
A. Except as provided for those parishes in Subsection E below, in addition to authority granted by other laws, any parish, municipality, industrial district, port, harbor and terminal district, or other political subdivision of the state, hereinafter referred to as "political subdivision," which is permitted by law to own land, buildings, or other property for industrial inducement purposes, shall have the authority to sell, lease, or otherwise dispose of, by suitable and appropriate contract, such transactions being hereinafter referred to as “transfers,” to any enterprise locating or existing within, outside of, or adjoining to such political subdivision, all or any part of an industrial plant site, building, port, harbor, or terminal facility, or other property owned by the political subdivision. In determining the consideration for any transfer, the govern *279 ing authority of the political subdivision may consider the potential value of the economic impact of the enterprise being induced to locate or expand within, outside of, or adjoining the political subdivision, as well as the value of the lands, buildings, or other properties involved. Prior to any transfer, the governing authority of the political subdivision shall give notice of its intention to do so, by publication of a notice of intention once a week for two consecutive weeks, beginning at least fourteen days from the date such action is contemplated. Such notice of intention shall include the following: (1) a general description of the proposed transfer, (2) a description of the property to be transferred, (3) the proposed consideration to be given in exchange for said property, (4) a statement that the proposed contract is on file for public inspection in the office of the political subdivision, (5) a statement as to the appraised value of such property as determined by a real estate appraisal made within the previous twelve months, and (6) a date, time, and place at which objections to such transfer will be received. Should five percent of the resident electors of the political subdivision object to said proposed transaction, an election shall be held for the purpose of submitting the question of the transfer to the voters in accordance with Chapter 6 of Title 18 of the Louisiana Revised Statutes of 1950.
B. The resolution or ordinance adopted by the governing authority authorizing any transfer of property of the political subdivision shall set forth, in a general way, the terms of the authorized transfer and that the contract is on file for public inspection in the office of the political subdivision. At the regularly scheduled meeting immediately prior to the meeting at which the resolution will be considered, the governing authority of the political subdivision shall announce to those persons present that the resolution will be considered at the next meeting. Such resolution or ordinance shall be published as soon as possible after adoption in one issue of the official journal of the political subdivision. For a period of thirty days from the date of publication of any such resolution or ordinance, any interested person may contest the legality of such resolution or ordinance or the validity of the authorized transfer, after which time, no one shall have any cause of action to contest the legality of the transfer for any cause whatsoever, and it shall be conclusively presumed thereafter that every legal requirement has been complied with, and no court shall have authority to inquire into such matters after the lapse of said thirty days.
C. This Section shall not apply to property acquired from the proceeds of industrial development bonds issued in compliance with the provisions of laws authorized by Article 6, Section 21, of the Louisiana Constitution of 1974 or issued by industrial development boards in compliance with the provisions of Chapter 7 of Title 51 of the Louisiana Revised Statutes of 1950, as amended. In such instances, property may be leased, sold or otherwise disposed of in compliance with such laws.
D. This Section shall not apply to the deep water ports of this state and shall not serve to alter, amend or detract from the rights, powers, and duties of'such deep water ports.
E. Within the parishes of St. Tammany and St. Mary, any municipality, industrial district, port, harbor and terminal district, or other political subdivision of the state, hereinafter referred to as "political subdivision”, which is permitted by law to own land, buildings, or other property for industrial inducement purposes, shall have the authority to sell, lease, or otherwise dispose of, by suitable and appropriate contract, such transactions being hereinafter referred to as "transfers”, to any enterprise locating or existing within such political subdivision, all or any part of an industrial plant site, building, port, harbor, or terminal facility, or other property owned by the political subdivision. In determining the consideration for any transfer, the governing authority of the political subdivision may consider the potential value of the economic impact of the enterprise being induced to locate or expand within the political subdivision as well as the value of the lands, buildings, or other properties involved. Prior to any transfer, the governing authority of the political subdivision shall give notice of its intention to do so, by publication of a notice of intention once a week for two consecutive weeks, beginning at least fourteen days from the date such action is contemplated. Such notice of intention shall include the following: (1) a general description of the proposed transfer, (2) a description of the property to be transferred, (3) the proposed consideration to be given in exchange for said property, (4) a statement that the proposed contract is on file for public inspection in the office of the political subdivision, (5) a statement as to the appraised value of such property as determined by a real estate appraisal made within the previous twelve months, (6) a date, time and place at which objections to such transfer will be received. Should five percent of the resident electors of the political subdivision object to said proposed transaction, an election shall be held for the purpose of submitting the question of the transfer to the voters in accordance with Chapter 6 of Title 181 of the Louisiana Revised Statutes of 1950.