# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 13-110

## OLYMPIA MINERALS, LLC, ET AL.

## VERSUS

## HS RESOURCES, INC., ET AL.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. C-2005-927
HONORABLE H. WARD FONTENOT, DISTRICT JUDGE, AD HOC

\*\*\*\*\*\*\*\*\*\*

## JOHN E. CONERY
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Elizabeth A. Pickett, and John E. Conery, Judges.

**AFFIRMED IN PART AND REVERSED IN PART.**

**David Ramsey Lestage**
**F. Steven Landreneau**
**Hall, Lestage & Landreneau**
**Post Office Box 880**
**DeRidder, Louisiana 70634**
**(337) 463-8692**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Aspect Resources, LLC**
    **Aspect Energy, LLC**

**Thomas M. Flanagan**
**Andy Dupre**
**Charles-Theodore Zerner**
**Flanagan Partners, LLP**
**201 St. Charles Avenue, Suite 2405**
**New Orleans, Louisiana 70170**
**(504) 569-0235**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Aspect Resources, LLC**
    **Aspect Energy, LLC**

**Barry Lee Wertz**
**Jonathan D. Baughman**
**Chris L. Halgren**
**McGinnis, Lochridge & Kilgore, LLP**
**1111 Louisiana, Suite 4500**
**Houston, Texas 77002**
**(713) 615-8500**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Aspect Energy, LLC**
    **Aspect Resources, LLC**

**Carlos R. Soltero**
**Mark Domel**
**Nicholas P. Laurent**
**McGinnis Lochridge & Kilgore, LLP**
**600 Congress Avenue, Suite 2100**
**Austin, Texas 78701**
**(512) 495-6000**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Aspect Energy, LLC**
    **Aspect Resources, LLC**

**M. Hampton Carver**
**John Anthony Dunlap**
**Carver, Darden, Koretzky, Tessier, Finn,**
**Blossman &Areaux, LLC**
**1100 Poydras Street, #3100**
**New Orleans, Louisiana 70163**
**(504) 585-3800**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
    **Olympia Minerals, LLC**
    **Olympia Minerals Leasing, LLC**

**Barry Barnett**
**Daniel H. Charest**
**Susman Godfrey, LLP**
**901 Main Street, Suite 5100**
**Dallas, Texas 75202**
**(214) 754-1900**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
 **Olympia Minerals, LLC**
 **Olympia Minerals Leasing, LLC**

**Brian D. Melton**
**Brian M. Gillett**
**Susman, Godfrey, LLP**
**1000 Louisiana, Suite 5100**
**Houston, Texas 77002-5096**
**(713) 651-9366**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
 **Olympia Minerals, LLC**
 **Olympia Minerals Leasing, LLC**

**Leslie R. Leavoy, Jr.**
**Attorney at Law**
**125 North Washington Street**
**Post Office Box 1055**
**DeRidder, Louisiana 70634**
**(377) 462-6051**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
 **Olympia Minerals, LLC**
 **Olympia Minerals Leasing, LLC**
 **The Wiser Oil Company**
 **Bass Partnership**
 **Cinco Resources, Inc.**
 **Direct Energy Partner, Ltd.**
 **Orr Exploration, Ltd. Sabine Development Company, LLC**

**H. Alston Johnson III**
**Phelps Dunbar, LLC**
**400 Convention Street, Suite 1100**
**Baton Rouge, Louisiana 70802-5618**
**(225) 346-0285**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
 **Olympia Minerals, LLC**
 **Olympia Minerals Leasing, LLC**

**David Patrick Long**
**Patton, Boggs, LLP**
**2000 McKinney Avenue, Suite 1700**
**Dallas, Texas 75201**
**(214) 758-1509**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
     **Cinco Resources, Inc.**
     **Direct Energy Partner, Ltd.**
     **Orr Exploration, Ltd.**
     **Hayes Exploration, Ltd.**
     **Tedora Exploration, Ltd.**
     **Sabine Development Company**

**CONERY, Judge.**

This case involves a dispute over a seismic contract with an option/requirement to lease and develop minerals in Beauregard and Calcasieu Parishes.

Plaintiffs, Olympia Minerals, LLC and Olympia Minerals Leasing, LLC, are referred to as Olympia in the opinion. The Olympia entities are successors in interest to El Paso Minerals, Inc. and El Paso Leasing, Inc. referred to as EPMI. Both El Paso Minerals, Inc. and El Paso Minerals Leasing, Inc. were subsidiaries of El Paso Production Company, referred to as El Paso.

Defendant, Aspect Resources, LLC, is referred to as Aspect. The intervenor, Aspect Energy, LLC, is specifically named in the portions of the opinion to which they are a party. The original co-defendant, HS Resources, Inc., is referred to as HSR. On August 1, 2001, HSR merged into Kerr-McGee and from that point on did business as Kerr-McGee Rocky Mountain, LLC. Kerr-McGee settled its portion of the suit prior to trial. Aspect is the sole remaining defendant.

Since 1984, the acreage and mineral interests at issue have been owned by El Paso through their subsidiaries, EPMI. The August 1, 2000 seismic contract at issue in this case, the North Starks Project Agreement (NSPA), obligated HRS and Aspect to conduct a 3-D seismic survey of the EPMI lands described therein and, allegedly, an obligation to lease 15% of these lands.

The EPMI acreage and mineral interests in dispute were sold to Olympia in 2003 in a transaction negotiated by Wellspring Royalties, Ltd. with the assistance of Brazos Gas Company. Both Wellspring Royalties, Ltd. and Brazos Gas Company became part owners of Olympia.

In January 2004, Olympia entered into a Master Sublease Agreement on its acreage in Beauregard and Calcasieu Parishes with Wiser Oil Company, referred to as Wiser Oil. That contract is referred to as the Sabine Project Agreement. Wiser Oil, as the operator of the Sabine Project, then entered into joint exploration agreements with a group of companies who are the non-Olympia plaintiffs and are referred to as the Working Interest Owners or WIOs. The WIOs include the following companies: Wiser Oil, Bass Partnership, Cinco Resources, Inc., Direct Energy Partner, Ltd., Hayes Exploration, Ltd., Orr Exploration, Ltd., Sabine Development Company, LLC, and Tedora Exploration, Ltd. In June 2004, Wiser Oil was acquired by and then merged into Forest Oil Corporation, referred to as Forest Oil.

The crux of this contractual dispute is: (1) whether Aspect had an obligation or an option to lease 15% of EPMI's mineral interests; (2) whether Aspect had a duty to conduct a seismic survey over all lands covered by the NSPA; and (3) whether Aspect was required to turn over all seismic data, including "field tapes" or "field data," to EPMI.

## PROCEDURAL HISTORY

The original pleading in this litigation was filed on September 22, 2005, by the plaintiff, Olympia. The petition alleges breach of the NSPA, seeks dissolution of the contract, damages, a declaratory judgment, and includes a claim for specific performance of that portion of the NSPA requiring Aspect to turn over all of the field data to Olympia. Joining Olympia as plaintiffs are Wiser Oil and the WIOs who joined Wiser Oil in the leases and subleases that Wiser Oil had received from Olympia on the NSPA acreage in 2004 pursuant to the Sabine Project Agreement.

The NSPA contained a Seismic Data License Agreement between the original parties, not included in the body, but attached and specifically identified as Exhibit D to the NSPA. The restrictive license ostensibly prevented Olympia from allowing others access to the seismic data developed by Aspect. Olympia believed, as did Aspect up until July 2004, that Olympia was properly operating under a less restrictive license agreement contained in a previous contract between the parties referred to as the Southtech License. The Southtech License allowed Olympia to share the seismic data obtained from Aspect over different lands in the same general area with Wiser Oil and the WIOs so as to interest these entities in developing Olympia's mineral acreage. Wiser Oil and the WIOs joined this suit and sought a declaratory judgment dissolving the restrictive licensing agreement contained in Exhibit D to the NSPA.

In early 2001, Aspect conducted a seismic 3-D survey on the south half of the acreage covered by the NSPA and turned over the survey results to EPMI. Olympia had secured possession of the survey in 2003 after acquiring the EPMI entities. In February 2004, Olympia discovered that certain important data, referred to as the field data, had not been turned over to Olympia by Aspect. As we will discuss later in the opinion, an advanced analytical step in 3-D seismic technology, Amplitude Variation with Offset (AVO), could not be performed without the field data. The AVO analysis of the data would enable the company seeking to develop the minerals to more accurately predict the exact location to drill. All plaintiffs sought a judgment from the trial court requiring Aspect to deliver all of the field data from all of the seismic work performed by Aspect.

The original defendants reconvened, alleging misappropriation of confidential seismic data and misuse of trade secrets in violation of the Louisiana

Unfair Trade Practices Act, (LUTPA), the Louisiana Uniform Trade Secrets Act, (LUTSA), and alleging unjust enrichment. Defendants also requested declaratory and injunctive relief against Olympia, Wiser Oil, and the WIOs. Aspect Energy intervened in the reconventional demand.

After the close of trial, the trial court allowed counsel to submit post-trial briefing and then issued extensive Reasons for Judgment. In its reasons, the trial court found that additional evidence was required in order to determine the amount of lost royalties it felt were owed to Olympia by Aspect. The court ordered, *sua sponte*, that the additional evidence necessary to calculate lost royalties could be submitted by stipulation, but if the parties were unable to agree on a figure within thirty days, the figure would be determined by a court-appointed expert. Following a post-trial hearing, the parties stipulated to the amount of $7,120,140, representing what the trial court ruled was Olympia's loss of royalties. Aspect objected to the entire post-trial proceeding and entered its stipulation subject to its objections.

The trial court ruled in favor of Olympia and found that Aspect had breached the NSPA and did have an obligation to pay for a mineral lease on at least 15% of the lands in question. The trial court also found that Aspect had breached the seismic contract by failing to complete a seismic survey on all the lands and/or mineral interests covered by the contract, and by withholding some field data on the lands and/or mineral interests it did survey.

In its August 14, 2012 Final Judgment, the trial court found in favor of Olympia and against Aspect for the following amounts, with judicial interest from date of judicial demand, September 22, 2005, until paid:

a. For the 15% mandated subleases, $1,537,500;

4

b.  For the incomplete survey, $4,525,000;

c.  For the 2001-2002 lost bonuses and rentals, $615,000;

d.  For the 2002-2005 lost bonuses and rentals, $486,875;

e.  For the lost royalties, $7,120,140.

The trial court granted a 50% credit on the judgment and interest in favor of Aspect by virtue of the settlement of co-defendants, HSR and Kerr-McGee.

The trial court also ordered Aspect and Aspect Energy to "make prompt delivery of the field tapes and all field data from the North Starks Project Agreement seismic survey when this judgment becomes non-appealable."

The trial court dismissed with prejudice all claims by the non-contracting parties, the WIOs, and it also dismissed with prejudice the reconventional demand urged by Aspect and Aspect Energy.  Costs were assessed 75% to Aspect and 25% to the WIOs.

For the following reasons, we affirm the judgment of the trial court in all respects, except for an item of damages the trial court labeled the "Loss Of Royalties" claim.  We reverse the award of $7,120,140 for lost royalties for the reasons assigned.

## ASSIGNMENTS OF ERROR

Aspect appeals the trial court's judgment on all issues and assigns errors as follows:

A.  The district court committed legal error when it ruled, on summary judgment, that Aspect had a legal duty to sublease 15% of the acreage subject to its option.

B.  The district court committed legal error when it concluded, after trial, that Aspect's geophysical permit obligated it to conduct a seismic survey over virtually all of the Property.

5

C.  The district court improperly disregarded the contract's limitation on damages through an erroneous finding of bad faith.

D.  The district court erred as a matter of law in assessing any damages against Aspect for not producing field tapes in the absence of evidence that El Paso/Olympia actually would have used them to earn a lawful profit.

E.  The district court erred as a matter of law in assessing damages for allegedly lost royalties, bonuses, and rentals absent proof that any minerals were lost through drainage or waste.

F.  The district court erred as a matter of law in awarding Olympia $4.5 million in damages to compensate it for the value of ownership rights in seismic data to which it had no claim under the parties' agreement.

G.  The district court committed legal error in concluding that breaches of the NSPA, if any, could justify the selective and retroactive dissolution of that agreement.

H.  The district court – based on the errors above – erroneously failed to address the substance of Aspect's reconventional demand, which was and remains meritorious.

Olympia answered Aspect's appeal and assigned the following errors, seeking a modification of the trial court's final judgment:

1.  The trial court erred in awarding only $7,120,140 in damages for lost royalties to Olympia, and that award should be increased to $23,076,902, plus judicial interest from the date of judicial demand;

2.  Olympia should be awarded attorney's fees, plus judicial interest, against each Aspect party, because it is a prevailing party in defending against Aspect's claims alleged violations of the Uniform Trade Secrets Act and the Unfair Trade Practices Act, which it claims Aspect brought in bad faith;

3.  Aspect Energy, LLC, which operates as part of a single business enterprise with Aspect Resources, LLC, should be cast in judgment along with Aspect Resources, LLC; and

4.  Olympia should be awarded additional attorney's fees for this appeal and any other relief to which entitled by law or equity.

The WIOs have appealed and assigned the following errors:

6

(1)   The district court erred in dismissing the damages claim brought by the WIOs, and damages should be awarded to the WIOs as follows: 1) the amount of $24,099,656 for the cost of drilling dry holes; 2) the amount of $92,307,607 (minus royalty burden) for the profits which would have been earned on production from good wells using the district court's representative wells over the representative time or, alternatively, the court should have awarded the WIOs the profits and lost time value of money that would have been earned from drilling good wells as set forth by the WIOs'expert George Hite;

. . . .

(4)   The district court erred in casting the WIOs for 25% of the court costs when it prevailed in its defense of the Aspect entities LUTSA and LUTPA claims.

The WIOs also adopted the entirety of Olympia's Appellee Brief and urge the acceptance of the trial court's rulings on its findings of fact and legal conclusions in favor of Olympia.   The WIOs join Olympia in the following assignments of error:

(2)   The district could erred in not casting Aspect Energy, LLC in judgment along with Aspect Resources, LLC for the damages they inflicted on  Olympia and the WIOs as these entities are of a single business enterprise;

(3)   The district court erred in failing to cast Aspect Resources and Aspect Energy in judgment to pay attorney fees incurred by Olympia Minerals, LLC, Olympia Minerals Leasing, LLC and the WIOs for their successful defense against the claim made by Aspect Resources and Aspect Energy for alleged violations of the Trade Secrets Act and the Unfair Trade Practices Act, which claims were brought by Aspect Resources and Aspect Energy in bad faith, and those fees should be awarded with judicial interest from the date of the judgment awarding them;

## STANDARD OF REVIEW AND APPLICABLE LAW

"[A]ppellate jurisdiction of a court of appeal extends to law and facts." La.Const. art. 5, § 10(B).   Our supreme court, in *Ryan v. Zurich American Insurance Co.*, 07-2312, p. 7 (La. 7/1/08), 988 So.2d 214, 219 (quoting *Bonin v.*

*Ferrellgas,* 03-3024, pp. 6-7 (La.7/2/04), 877 So.2d 89, 94-95), reiterated the

standard of review as follows:

> A court of appeal may not set aside a trial court's finding of fact
> in the absence of manifest error unless it is clearly wrong. Although
> we have spelled out the appropriate standard of review under the
> manifest error standard on numerous occasions, it bears repeating,
> because the court of appeal in this case improperly applied this
> standard. As this Court has recently stated, the manifest error/clearly
> wrong standard is "now well-established doctrine."
>
> Under the manifest error standard, in order to reverse a trial
> court's determination of a fact, an appellate court must review the
> record in its entirety and (1) find that a reasonable factual basis does
> not exist for the finding, and (2) further determine that the record
> establishes that the fact finder is clearly wrong or manifestly
> erroneous. On review, an appellate court must be cautious not to re-
> weigh the evidence or to substitute its own factual findings just
> because it would have decided the case differently.

When interpreting contracts, appellate courts apply the following standard of

review:

> Where factual findings are pertinent to the interpretation of a contract,
> those factual findings are not to be disturbed unless manifest error is
> shown. However, when appellate review is not premised upon any
> factual findings made at the trial level, but is, instead, based upon an
> independent review and examination of the contract on its face, the
> manifest error rule does not apply. In such cases, appellate review of
> questions of law is simply whether the trial court was legally correct
> or legally incorrect.

*Rogers v. Restructure Petroleum Mktg. Serv.,* 01-1396, p. 4 (La.App. 3 Cir.

3/6/02), 811 So.2d 1154, 1158 (quoting *Evangeline Parish Sch. Bd. v. Energy

Contr.,* 617 So.2d 1259, 1265 (La.App. 3 Cir.), *writ denied,* 624 So.2d 1228

(La.1993) (citations omitted)).

Questions of contractual interpretation are questions of law which are

subject to a de novo standard of review. *Mitchell v. Patterson Ins. Co.,* 00-612

(La.App. 3 Cir. 12/6/00), 774 So.2d 366. Contracts have the force of law between

the parties, and the courts are bound to interpret them according to the common

8

intent of the parties. La.Civ.Code arts. 1983 and 2045. If the words of the contract are clear, unambiguous, and lead to no absurd consequences, the court need not look beyond the contract language to determine the true intent of the parties. La.Civ.Code art. 2046. "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La.Civ.Code art. 2050. Whether or not a contract is ambiguous is a question of law. *La. Ins. Guar. Ass'n. v. Interstate Fire & Cas. Co.*, 93-911 (La.1/14/94), 630 So.2d 759.

In *Bernard v. Hartford Ins. Co.*, 09-71, p. 6 (La.App. 3 Cir. 6/3/09), 12 So.3d 1098, 1102, *writ denied*, 09-1524 (La. 10/9/09), 18 So.3d 1285 (quoting *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989)), the court stated:

> When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the fact-finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.

**FACTUAL DESCRIPTION OF THE NORTH STARKS PROJECT AGREEMENT**

Before addressing the assignments of error, we will briefly outline the pertinent portions of the agreement in dispute.

The main contract in dispute is the North Starks Project Agreement (NSPA), signed July 19, 2000, effective August 1, 2000. The purpose of the NSPA is clearly stated in the second paragraph of the document:

> HSR and ASPECT desire to conduct a 3-D seismic survey (the "Survey") covering approximately 135 square miles over an area encompassing the North Starks Project Area as described in Exhibit A-1(the "North Starks Project Area"), located in Calcasieu and Beauregard Parishes, Louisiana. EPMI desires to enter into this Agreement to more fully set forth their agreement regarding HSR and ASPECT's identification, exploration and development of potential hydrocarbon accumulations and the acquisition by HSR and ASPECT

of rights to conduct the Survey and drill exploratory wells on EPMI lands included in the North Starks Project Area.

Section 1 of the NSPA, entitled "EPMI LANDS," contains the explanation of the area subject to the 3-D seismic survey to be conducted by HSR and Aspect and states, in pertinent part:

> 1.1 . . . Exhibit A-1 describes the outline of the North Starks Project Area. All lands within the North Starks Project Area, as of the effective date of this Agreement, which are owned by EPMI as a mineral owner and/or held by EPMI as a lessee under oil and gas leases will be referred to in the Agreement as the "EPMI Lands" and are shown on the plat attached as Exhibit A-2.

**(1)** ***Aspect's Obligation to Lease a Minimum of 15% of the EPMI Lands***

Sections 1.2 and 1.3 are the focus of the first dispute between the parties, the obligation of HSR and Aspect to lease a minimum of 15% of the EPMI Lands:

> 1.2 EPMI hereby grants to HSR and ASPECT, effective August 1, 2000, a 12-month non-exclusive geophysical permit covering all interests of EPMI in the EPMI Lands described on Exhibits A-3 and A-4, and a 12-month exclusive option to sublease covering all interests of EPMI in the EPMI Lands, described on Exhibit A-3. Consideration for the option to sublease shall be $35 per net mineral acre (the "EPMI Option Consideration"). The EPMI Option Consideration shall be paid to EPMI within two (2) business days after execution of this Agreement by EPMI. Immediately upon execution of this Agreement, HSR and ASPECT shall record a Memorandum of the geophysical permit and option to sublease in Calcasieu and Beauregard Parishes in the form attached hereto as Exhibit B.

> 1.3 The exclusive option to sublease shall provide for a bonus consideration of $250 per net mineral acre to EPMI on which HSR and ASPECT elect to exercise their option to sublease (the "EPMI Bonus Consideration"), provide that the sublease will contain a 25% overriding royalty interest to EPMI as lessor inclusive of the royalty interest provided in the Lease, provide for a term of three (3) years, and $250 per acre rentals ("the fixed annual rental"), all in substantially the form attached to this Agreement as Exhibit C. *HSR and ASPECT shall lease a minimum of 15% of the EPMI Lands subject to the exclusive option, and shall work jointly with EPMI to prioritize the EPMI Lands that may be subject to prescription and actively manage the exploration program to maximize EPMI's preservation of its mineral interests.* EPMI shall execute and deliver a

sublease within thirty (30) business days from receipt of HSR and ASPECT's written election to exercise the option to sublease. HSR and ASPECT shall furnish the EPMI Bonus Consideration to EPMI within five (5) business days from receipt of the executed sublease.

(Emphasis added.)

At the conclusion of the original one year term of the contract, HSR and Aspect sought an additional three-month extension of the option, but EPMI refused to extend the option past the twelve-month option period ending July 31, 2001.

**(2)** ***Aspect's Obligation to Conduct a Seismic Survey of All EPMI Lands***

The second issue is whether HSR and Aspect had the obligation to conduct a 3-D seismic survey of all the EPMI Lands. The italicized portions of Section 2.1, when compared to the italicized language of Section 2.3, illustrate the tension between the two sections of the contract:

> 2.1 HSR and ASPECT shall commence the acquisition of 3-D seismic data across the EPMI Lands within six (6) months from the effective date of this Agreement, and shall conduct the Survey at the sole cost and expense of HSR and ASPECT. *HSR and ASPECT shall notify EPMI prior to commencement of the survey of the final shoot outline, and shall furnish a copy of the pre-plot to EPMI. HSR and ASPECT shall not be obligated to include all EPMI Lands optioned hereunder in the final survey outline.*

> 2.3 HSR and ASPECT shall provide to EPMI a copy of the 3-D seismic data *across the EPMI Lands*, including the EPMI Lands covered by the geophysical permit described in subparagraph 2.2 hereinabove, plus a one-mile "halo", free of cost to EPMI, in 8mm SEG-Y format within 120 days from HSR and ASPECT's receipt of the final processed migrated data from the processor.

(Emphasis added.)

**(3)** ***Aspect's Obligation to Deliver the Field Data to EPMI***

The third major dispute involves the obligation of HSR and Aspect to deliver the field data from the seismic survey to EPMI.

Section 2.3, states in pertinent part:

EPMI shall execute, prior to receipt of the seismic data, and shall remain subject to the Seismic Data License Agreement attached hereto as Exhibit D. *The seismic data furnished to EPMI shall include field and support data, final stack and migrated data over the EPMI Lands plus the one-mile "halo", if collected.*

(Emphasis added.)

### *Import of Exhibit D to the NSPA – The Seismic Data License Agreement*

Section 2.3, coupled with the obligation of EPMI to execute the Seismic Data License Agreement, provides a partial basis for Aspect's reconventional demand against Olympia for several breaches of the general provisions of the NSPA and the alleged violations of the Seismic Data License Agreement by Olympia, Wiser Oil, and the WIOs. This section also provides a basis for Wiser Oil and the WIOs' request for declaratory judgment with respect to the field data from Aspect, as required by this section of the NSPA, and a request for declaratory judgment cancelling all obligations to Aspect under the Seismic Data License Agreement.

The trial court determined as a finding of fact that the Seismic Data License Agreement was never signed, and that issue was not in dispute. However, the trial court ruled, both prior to trial and in its final ruling post-trial, that "the absence of signatures did not vitiate the license."[1] The trial court further found, however, "The efficacy *vel non* of the license rests upon the enforceability of the NSPA." The import of this finding and its relationship to Aspect and Aspect Energy's reconventional demand will be addressed separately.

---

[1] The Seismic Data License Agreement provides, in pertinent part: "8. The non-exclusive use license granted in this agreement shall continue for a term of forty-nine (49) years, and can be automatically renewed for a like term of forty-nine (49) years, for no additional consideration, unless otherwise terminated by the mutual consent of both parties."

*Miscellaneous Provisions of the NSPA*

The remaining pertinent parts of NSPA are contained in Section 5, which provides the miscellaneous provisions governing the Agreement:

> 5.1    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and, except as otherwise prohibited, their respective successors and assigns; and except as otherwise stated herein, *nothing contained in this Agreement, or implied herein, is intended to confer upon any other person or entity any benefits, rights or remedies.    The parties agree that this Agreement may not be assigned, in whole or in part, without the express written consent of the other party, which shall not be unreasonably withheld.*

(Emphasis added.)

This portion of the NSPA is the focus of the claim of Wiser Oil and the WIOs.  Their claim against Aspect centers on the refusal of Aspect to turn over the full extent of the seismic data to EPMI/Olympia when requested and the effect this refusal had on a subsequent January 2004 Master Sublease Agreement between Wiser Oil and Olympia, the Sabine Project Agreement, covering the same acreage in Beauregard and Calcasieu Parishes.

Wiser Oil, as operator of the Sabine Project, entered into joint exploration agreements with the WIOs to facilitate exploration for oil and gas on Olympia's lands in Beauregard and Calcasieu Parishes.  The basis of the WIOs' claim is that at the time of the signing of the Sabine Project Agreement, Olympia transferred exclusively to Wiser Oil the right of access to, and the right to use, copy, and process all seismic data in Olympia's possession, subject to any applicable licenses and agreements.  Wiser Oil and the WIOs allege the failure of Aspect to turn over the field data from the 3-D seismic shoot to Olympia affected the drilling decisions of the WIOs and caused them to lose revenue.

The Miscellaneous section of the NSPA further provides:

5.2 Unless sooner terminated or longer extended by mutual agreement of the parties hereto in writing, this Agreement shall remain in force and effect for the term of the exclusive option to sublease. The Seismic Data License Agreement, executed by the parties in the form attached hereto as Exhibit D, shall remain in full force and effect until such time as it terminates by its own terms.

The term of the Agreement was from August 1, 2000 until July 31, 2001, and it was not extended. Thus, the NSPA expired under its own terms on July 31, 2001.

Section 5.2 further addresses the application of the Seismic Data License Agreement, which has a term of forty-nine years and contains provisions restricting the access and control of the seismic data obtained under the NSPA. If the license agreement was found to be in effect, the WIOs could not use the 3-D seismic data generated by Aspect pursuant to the NSPA to fulfill their obligations under the terms of the Sabine Project Agreement with Olympia.

Section 5.7 provides that Louisiana law applies to this litigation and was applied by the trial court in all of its rulings.

Section 5.8 waives the right to a jury trial and was addressed by the trial court in a motion to maintain the jury by Aspect and Aspect Energy against Olympia and the WIOs. The trial court denied the motion and struck the jury demand, finding that the language of Section 5.8 controlled. The trial court further found that the Aspect entities could have urged their claims that EPMI/Olympia violated the Seismic Data License Agreement and was liable for damages under LUTPA and LUTSA and for unjust enrichment in a separate action.

One additional provision of the NSPA played a crucial role in the trial court's decision:

5.9 NO PARTY SHALL BE REQUIRED TO PAY OR BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL, EXEMPLARY,

PUNITIVE OR INDIRECT DAMAGES (WHETHER OR NOT ARISING FROM ITS NEGLIGENCE) TO ANY OTHER PARTY.

Section 5.9 and the application of La.Civ.Code arts. 2004 and 1997 are prominently discussed by the trial court in its determination that consequential damages were due based on the trial court's finding of bad faith by Aspect in connection with the NSPA, all addressed below.

## ANALYSIS AND DISCUSSION

### *A Fixed Term Contract was Breached*

In its ruling, the trial court correctly found that La.Civ.Code art. 1990 provides that if the term of the obligation is fixed, there is no requirement that performance be demanded or that the obligor be placed in default. In this case, the NSPA gave Aspect twelve months to perform, so the obligation was fixed. The trial court found that Aspect failed to perform all three of its major obligations to Olympia under the terms of the NSPA and breached the contract. We agree.

### *Aspect's Assignment of Error A:  Aspect's Obligation to Lease 15% of the EPMI Lands*

Aspect has repeatedly urged that the option to lease 15% of the mineral acreage provided for in Section 1.3 of the NSPA was only an option and not an obligation. In its final judgment, the trial court correctly found that Aspect had "not proffered any serious excuse or justification" for breaching its obligation to lease 15% of the EPMI Lands. Evidence and testimony during trial more than adequately supported the trial court's decision. The trial court determined that the term "subject to exclusive option" in the NSPA was not a "pure option." Instead, the contract imposed an obligation on Aspect and HSR to lease a minimum of 15% of the EPMI Lands. The trial court also found that Louisiana law contained no provision preventing the option from being exercised in this manner.

The testimony and evidentiary support for the trial court's decision are more specifically addressed in our discussion of the court's finding of Aspect's bad faith in connection with the performance of its obligations under the NSPA. We affirm the trial court's ruling on this issue, finding no abuse of discretion.

***Aspect's Assignment of Error B: Failure to Survey all of the EPMI Lands***

The trial court previously denied cross-motions for summary judgment on this issue, finding an ambiguity between the second paragraph of the NSPA and the portion of the Agreement under the heading "SEISMIC SURVEY," paragraph 2.1.

The second paragraph of the NSPA reads, "HSR and ASPECT desire to conduct a 3-D seismic survey (the "Survey") covering approximately 135 square miles over an area encompassing the North Starks Project Area as described in Exhibit A-1 . . . ."

The disputed portions of paragraph 2.1 read in the first sentence, "HSR and ASPECT shall commence the acquisition of 3-D seismic data *across the EPMI Lands . . . .*" and in the last sentence, "HSR and ASPECT shall *not be obligated to include all EPMI Lands optioned* hereunder in the final survey outline." (Emphasis added.)

Aspect argued the last sentence of paragraph 2.1 should be interpreted to mean that HSR and Aspect could survey as much or as little of the property described in the contract as they chose. Thus, their decision to survey only the south half of the property was not a breach.

The trial court relied on La.Civ.Code arts. 2049 and 2050, which provide that contractual provisions should be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. The trial

court found that to give the final sentence of paragraph 2.1 the meaning urged by Aspect would negate the whole obligation to survey.

In an attempt to reconcile the issue, pursuant to La.Civ.Code art. 2049, the trial court then resorted to extrinsic evidence to resolve the ambiguities created by the two clauses in question. *See Mobil Exploration & Producing U.S. Inc. v. Certain Underwriters Subscribing to Cover Note*, 95-3317(A) (La.App. 1 Cir. 11/20/02), 837 So.2d 11, *writ denied*, 03-0418 (La. 4/21/03), 841 So.2d 805, and *writs denied*, 03-417, 03-427, 03-438 (La. 5/16/03), 843 So.2d 1129, 1130. The trial court also properly sought to determine the intent of the parties. *See Henry v. Ballard & Cordell Corp.*, 418 So.2d 1334 (La.1982).

The trial court considered evidence of a draft of the NSPA prepared by Janet W. Pasque, Vice-President of HSR (later Kerr-McGee). The draft was ultimately approved by Joseph Mills, Vice-President of EPMI (later Olympia). Ms. Pasque's draft contemplated an exclusive one-year option on designated EPMI Lands in exchange for which HSR would conduct a 3-D seismic survey across the lands. There was no proviso that the survey would be anything less than the whole.

The testimony of Blake Anderson, chief negotiator for El Paso on the NSPA, confirmed that the survey was supposed to cover all of the EPMI Lands plus a one-mile halo. The testimony of John A. Mills, an officer with El Paso who supervised negotiation of the NSPA, supported Anderson's testimony. Mills explained that the *quid pro quo* was that all lands which were to be tied up in a year-long option were to be included in the survey. Otherwise, Mills said, El Paso would not have entered into such an agreement.

Mills, a thirty-year veteran of the oil and gas exploration business, also clarified for the trial court the meaning of the contract language which stated that

17

the survey did not obligate Aspect to "include all EPMI Lands." Mills explained that such a clause was customary in the industry and was designed to deal with surface issues, i.e., places where surveying crews could not work, such as towns, cemeteries, or tracts lacking the proper permit, which would create voids in the survey.

In applying La.Civ.Code art. 2047, which requires giving the words of a contract their generally prevailing meaning, and technical terms their technical meaning when the contract involves a technical matter, the trial court determined that surface obstacles had no bearing on Aspect's obligation to survey all of the EPMI Lands. The trial court specifically found that the language of the last sentence of paragraph 2.1 was not applicable and stated, "It is obvious that the division of the survey into two phases which resulted in the entire northern half of the optioned lands being omitted has nothing to do with surface obstacles."

The trial court rejected the testimony of Anita Ashland on this issue. Ms. Ashland worked for HSR at the time of the negotiation of the NSPA. Ashland testified that she understood that HSR and Aspect could survey less than the whole of the optioned lands. The trial court instead accepted the testimony of Mills, whose interpretation of the NSPA conformed to La.Civ.Code arts. 2049 and 2050, thereby giving effective meaning to the provision under review.

Based on the testimony and evidence, the trial court found the decision by Aspect and HSR to conduct the survey in two phases was unilateral and did not form part of the NSPA. The failure to complete the second phase in the time frame of the NSPA amounted to the second serious violation of Aspect's obligations.

The trial court's findings of fact and credibility decisions are accepted by this court and are not manifestly wrong.

***Aspect's Assignment of Error C: The Award of Damages Based on a Finding of Aspect's Bad Faith***

Paragraph 5.9 of the NSPA precludes an award of consequential damages. However, the trial court found the application of La.Civ.Code arts. 2004 and 1997, coupled with its finding of a bad faith breach by Aspect of the provisions of the Agreement, rendered the NSPA's prohibition against Olympia's recovery of consequential damages null.

Aspect's actions in breaching the NSPA are specifically addressed by the trial court:

> In summary, the two major breaches of the NSPA by defendants (failure to lease the minimum acreage and failure to complete the survey) were not the result of negligence, unforeseen events, or even a lack of ability. These were conscious and calculated business decisions. This must be coupled with the fact that defendants pursued their usual strategy of waiting until the contracted option had expired and then obtain[ing] better leases from the aggrieved party.
>
> . . . .
>
> Finally, there is no question about the intentional nature of the failure to make the field tapes available to the mineral owner. While inadvertence may have been an excuse when El Paso was still the owner, the "shell game" played by Aspect and Kerr-[McGee] when Olympia sought the tapes is inexcusable. And, in the end, all pretense was dropped and the defendants have engaged in a blatant refusal to perform that obligation since 2004.

The trial court's decision on this issue is not manifestly wrong and is affirmed.

***Aspect's Assignment of Error D: Damages Resulting from Aspect's Failure to Produce the Field Data***

Aspect claims that EPMI did not request the field data from the 3-D seismic shoot until 2004, three years after the contract ended. Based on La.Civ.Code art. 1990, however, no request for the field data from the 3-D seismic shoot by EPMI was required during the term of the contract, and no request was required for the

19

default to occur. The NSPA ended by its own terms on July 31, 2001. No request for the field data was made until after EPMI was sold to/merged with Olympia. Olympia first became aware of and made requests of Aspect to turn over the field data in February 2004, almost three years after the expiration of the contract.

The trial court accepted Aspect's argument that industry practices dictated that a request for the field data would have been expected. However, once Olympia acquired the El Paso entities, the trial court found a number of requests were made by Olympia for the field data without success, even after it became clear to Aspect that Olympia was the full and legitimate successor to El Paso.

The trial court further found:

> The initial breach for not making the field tapes available to El Paso was exacerbated further by withholding them from Olympia. The court also takes note that Aspect had not transferred the field tapes to Olympia up to and including the trial of this matter even though Aspect has not denied that the contract language is clear as to the obligation to do so.[2]

As will be discussed below, the trial court dissolved the NSPA, and after a discussion of the requirement of restoration pursuant to La.Civ.Code art. 2018, found specific performance applicable to the field data (field and support data, final stack and migrated data). In ordering specific performance pursuant to La.Civ.Code art. 1986 and *Lombardo v. Deshotel*, 94-1172 (La. 11/30/94), 647 So.2d 1086, the trial court mandated that Aspect, at their expense, promptly deliver to Olympia's office the field data and any associated files or records. We affirm its decision on this issue.[3]

---

[2] Aspect's attorney sent a letter to the trial court post-trial, dated May 4, 2012, which pointed out that a confidentiality agreement on the issue was entered into between the parties in 2006, just after the litigation commenced. The field data was turned over to Olympia's attorney for use by its experts by court order, subject to confidentiality, in September 2009.

[3] The Confidentiality Agreement in place controls until all appeals are final.

The trial court also awarded damages caused by Aspect's failure to deliver to Olympia the field data from the seismic survey it conducted. In calculating the damages claimed, Olympia again relied on the opinion of George Hite. Hite's opinion was partially based upon work done by another Olympia expert witness, Thomas R. Wittick.

Wittick explained the importance of the field data in connection with the advances made in the oil and gas industry. Although the data Aspect initially delivered to El Paso was useful and resulted in a number of successful wells, the data which was not delivered, particularly the field tapes, had an additional value.

In particular, Wittick explained that advances made in 3-D seismic technology, such as the advanced analytical step, Amplitude Variation with Offset (AVO), require the use of field data. In his explanation of AVO to the trial court, Wittick indicated AVO has been recognized as being very effective in identifying oil and gas reservoirs. As a result, AVO is in common usage by the industry in Calcasieu and Beauregard Parishes. However, without the field data from the 3-D seismic survey, an AVO analysis could not be performed in this case.

For the purposes of conducting an AVO study for trial, Aspect provided Wittick with the field data, with which he conducted an extensive study of the North Starks survey. He concluded that the AVO gave very reliable predictions for the project area.[4]

Hite, using the estimated ranges established by the Wittick study, applied a probability methodology to gauge the potential success of the prospects which had not been drilled. Hite applied his methodology to the production history of four

_____

[4] The September 2009 Confidentiality Agreement allowed Olympia's attorneys and experts the use of the field tapes and data for trial purposes.

actual wells that had been drilled in the North Starks area, and he found the actual drilling results to be remarkably close to the predictions he had made using only the AVO data.

Hite then took into account the difficulties of creating a drilling schedule, and after deducting costs and using the known price of gas during the pertinent periods, he reached a net recovery figure for each well. He then extrapolated Olympia's share based on its percentage of interest, all of which produced a figure that Hite calculated as Olympia's delay damages, or the loss of production Olympia would have been paid had Aspect produced the field data timely. Hite calculated these delay damages at $23,076,902. The trial court also termed these damages "delay damages," and this is the amount Olympia sought in its answer to appeal.

The trial court, however, did not fully accept Hite's calculations as a basis for Olympia's delay damages, instead finding a flaw in Hite's model, i.e., Hite's failure to take into account the legal duty of Olympia, the aggrieved party, to mitigate damages pursuant to La.Civ.Code art. 2002.

The trial court, based on the failure of Aspect to conduct the 3-D seismic survey on the northern half of the NSPA area, divided the acreage into the northern and southern halves. Because Aspect failed to survey the northern half of the NSPA area, the delay was caused by not having any seismic data until the Hurricane Creek 3-D seismic survey was done by Wiser Oil and the WIOs. That survey was done early in 2006, after Olympia had sub-leased the acreage in question to Wiser Oil in the Sabine Project Agreement.

The trial court found that a period of one year, from August 2001 to August 2002, would be considered a reasonable amount of time for Olympia to have been

deprived of profits relating to the unsurveyed northern half of the NSPA acreage, because it could have had another company do the survey, just as Wiser Oil and the WIOs had the Hurricane Creek Survey done. *See Unverzagt v. Young Builders, Inc.*, 215 So.2d 823 (La.1968).

The trial court determined that the delay damages for the southern half of the mineral lands covered by the NSPA were caused by the expectation of EPMI, and later by Olympia, that eventually the field data would be forthcoming, because EPMI had already paid Aspect for this survey. The trial court's calculation for the southern half of the NSPA acreage included the time period from 2002 to 2005.[5]

*Lost Bonuses and Rentals*

After an extensive analysis, the trial court applied La.Civ.Code art. 1995[6] to determine Olympia's past losses, as well as the future profits lost due to the actions of Aspect. The trial court found two different sources of future profits Olympia had lost.

The first was the "lease bonus payments which were missed for the reason that Olympia did not have the seismic information on hand to market its mineral interests to entice potential lessees." The trial court found that "the 15% figure from the complex negotiations which produced the NSPA" could have been distorted, and therefore reduced the figure to 10%, considering that EPMI had successfully subleased some property in the one-year period following the NSPA.

Additionally, the $250 per acre model lease in the NSPA was not the going rate for individual mineral leases in that area. The trial court reduced the price per acre to $150, based on arms-length negotiations for mineral leases with other

---

[5] This was the time period later named by the trial court as the "royalty deficit span."

[6] Louisiana Civil Code Article 1995 provides: "Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived."

companies after the end of the NSPA. Therefore, for the first year of the delay following the end of the NSPA, the trial court awarded Olympia $150 per acre for 10% of the 41,000 acres available for leasing in the northern half of the NSPA acreage, lost bonuses, and lost rentals in the amount of $615,000.

The trial court found that Aspect was not responsible for lost lease profits on the northern half of the NSPA acreage after August 2002. Instead of trying to calculate the expected profits from leases, in light of the prospect that more wells would be brought on line, the trial court estimated a "mean average of 5% of the acreage would have continued payments from August 2002 until October 2005[.]"

Therefore, the trial court awarded Olympia "5% of the 20,500 acres (southern half) multiplied by $150.00 per acre," for the lost annual lease rental revenue. That figure multiplied by three years and two months amounts to an award to Olympia for lost bonuses and rentals in the amount of $486,875 for the southern half of the NSPA acreage. We affirm both awards, as there was sufficient evidence in the record at the time of trial to support these claims.

### Aspect's Assignment of Error G: Aspect's Breaches of the NSPA did not Justify Selective and Retroactive Dissolution of that Agreement

The trial court found that dissolution of the NSPA was proper pursuant to La.Civ.Code art. 2014. This conclusion was premised on its finding that Aspect's performance of its obligations under the NSPA did, in fact, substantially impair the interest of the obligee, Olympia.

Relying on La.Civ.Code art. 2013, the trial court further found, "in an action involving judicial dissolution, the obligor who failed to perform may be granted, according to the circumstances, an additional time to perform." In regard to a) the 15% lease obligation and b) the complete survey obligation, the trial court found

that neither were now of any use to Olympia.[7] The only remaining obligation of any value to Olympia was that of transferring to Olympia the field data associated with the NSPA shoot, which the trial court ordered. Again, the trial court's decision on this issue was based on competent evidence and is not manifestly wrong.

***Aspect's Assignment of Error F:  Specific Consequential Damages for Breach of the NSPA***

Having found Aspect in bad faith, thus abrogating the clause in the NSPA prohibiting consequential damages, the trial court then addressed the specific consequential damages to which Olympia was entitled. In its determination of the damages for the loss of the lease bonus payments mandated by the NSPA and the loss associated with the incomplete survey, the trial court relied on the testimony of George Hite, a petroleum engineer and an expert in the evaluation of oil and gas interests.

The trial court awarded Olympia $1,537,500 for the loss of the lease bonus mandated by the NSPA based on Aspect's failure to lease 15% of the acreage. The amount was calculated by taking the 15% lease obligation of the contract and applying it to the 41,000 (rounded out) North Starks acres that the trial court found were available for lease, and then multiplying that number by $250, the per acre amount called for in the contract. We affirm.

The trial court then accepted Hite's calculation of $4,525,000 as the cost to Olympia for its loss associated with the incomplete survey conducted by Aspect. That figure was based on the amount Olympia paid to Wiser Oil for the Hurricane

---

[7] All of Olympia's interest had been subleased to Wiser Oil (now Forest) in the Sabine Agreement. Olympia had a 3-D seismic survey done on the Northern half of the NSPA, named the Hurricane Creek Survey, in 2006.

Creek Survey on the northern half of the NSPA and was found to be reasonable by the trial court. The trial court's decision on this item of damages is also affirmed.

***Aspect's Assignment of Error E and Olympia's Assignment of Error 1: Damages Assessed for Lost Royalties***

Aspect appeals the trial court's award of $7,120,140 to Olympia for loss of royalties. Olympia answered the appeal and claimed the trial court's award of $7,120,140 was insufficient and that $23,076,902 should be awarded by this court. Olympia claims that its expert, Hite, relied on and utilized the calculations of Aspect's own expert, Calvin Barnhill, to calculate the amount claimed. Barnhill had calculated Aspect's alleged damages in reconvention for improper use of the seismic data on the same acreage.

The trial court again applied La.Civ.Code art. 1995, as interpreted by this circuit in the case of *Breaux v. Pan American Petroleum Corp*., 163 So.2d 406, (La.App. 3 Cir.), *writ denied*, 165 So.2d 481 (La.1964). However, the trial court then created what it referred to as the "royalty deficit span," to compensate Olympia for the loss of royalties caused by the delay in turning over the field data. The trial court defined the royalty deficit span as the thirty-nine month, fourteen-day period from August 1, 2002 (one year after NSPA) to October 14, 2005 (one year after the Kendall letter).[8] The trial court concluded that Aspect owed Olympia compensation for the absence of royalties from its idle land during this time period.

The trial court relied on the uncontested expert testimony of Hite to provide a foundation for the issue of lost profits due to the delay in developing the mineral lease. Hite based his calculations partially on his opinion that "the activity in the

_____

[8] The evidence at trial showed that on October 14, 2004, Thomas W. Kendall, Senior Counsel with Kerr-McGee, sent correspondence to Olympia threatening litigation for violations of the NSPA. Kendall essentially claimed Olympia violated the Seismic Data License Agreement by giving confidential seismic data to Wiser Oil and the WIOs.

NSPA area now has known reservoirs and that, given the history of the geologic formations beneath it, extending from Texas to Louisiana, the existence of other reservoirs is almost certain."  According to the trial court, Hite's testimony supported the trial court's "first premise that, to a sufficient degree of certainty on which to base damages, some level of exploration, drilling and production during the royalty deficit span would have occurred."

The failure to provide the field data to Olympia during the royalty deficit span meant no AVO could be performed, despite Olympia's possession of the processed data from the southern half of the project area.

The trial court relied on the testimony of Mark Bush with Forest (previously Wiser Oil) to emphasize the importance of an AVO analysis in the evaluation of a prospect.  The trial court noted that Bush testified that in a separate transaction, after Forest saw the AVO analysis of the same 3-D seismic survey for which Forest had earlier reviewed only the processed data, Forest changed its mind, and the company pooled its acreage into the prospect for the Abdalla 18-1 well, a successful venture.  Thus, the trial court determined that "the speculation is not whether El Paso/Olympia would have had successful wells drilled on the North Starks property, but the question becomes how many and how successful would they have been."

Citing La.Civ.Code art. 1995 and *New Iberia Sugar Co. v. Lagarde*, 58 So. 16 (La.1912), the trial court found that the law entitles an obligee to lost profits based on such calculations, so long as the losses are not too remote or speculative.

In order to calculate the delay damages caused by Aspect's failure to turn over the field data, the trial court next determined that four commercial wells were

drilled on the NSPA acreage in a year's time after activity picked up in 2004.[9]  It concluded that "a like number would have been drilled on the subject property during the royalty deficit span **but for** the violations by the obligors of the NSPA."

The trial court decided not to engage in speculation based on the expert opinions of the "Hite/Wittick combination about valuing prospects that have not been proven and wells that have not been drilled."  Instead, it determined "the best measure of Olympia's lost royalties would be the number of royalty payments that were received during a *later*, but equal time period" from the four different wells it selected.  (Emphasis added.)  Taking into account the variation in market prices and production expenses, the trial court found it "reasonable to assume that the royalties Olympia should have received for a given amount of production in the royalty deficit span would be comparable (exactitude is not required) to the actual royalties received in the subsequent 39 months and 14 days for the same volume of production" from the four wells the trial court selected for its comparison.

Thus, the trial court awarded as reasonable damages to Olympia for lost royalties during the royalty deficit span "a sum equal to the royalties received from the four listed wells in the subsequent thirty-nine month and fourteen day period."  Specifically, this included the time period from October 15, 2005 to December 29, 2008, approximately three years and three and a half months.

The trial court then concluded that the evidence necessary to determine a "sum certain" during this time period, as required by La.Code Civ.P.  art. 1841, was not in the record and gave the parties the option of either agreeing to a specific

---

[9] Evidence presented at trial revealed the identity of the first four wells drilled on the North Starks acreage as follows: Olympia 25-1 (spud date 6/15/04); Temple Inland 2-1 (spud date 11/17/04); Olympia 25-2 (spud date 2/15/05); and Kirby Jones 36-1 (spud date 4/1/05).

amount by stipulation within thirty days, or a court-appointed expert would supply the specific amount of lost royalty damages to the trial court.

Aspect argues in this assignment of error that the trial court did not have the authority to reopen the evidence to obtain a sum certain and that Olympia failed to claim or present any evidence of lost royalties. We agree.

In certain circumstances, a trial court has the authority to reopen the record to allow additional evidence. This court in *Parkes v. Prien Pines Nursery,* 98-384, p. 4 (La.App. 3 Cir. 11/4/98), 722 So.2d 36, 40-41, *writ denied*, 98-2993 (La. 1/29/99), 736 So.2d 837 (citing *State Dep't of Transp. & Dev. v. Latiolais,* 613 So.2d 1009 (La.App. 3 Cir.), *writ denied*, 619 So.2d 545 (La. 1993)), affirmed the Workers' Compensation Judge's reopening of the record to take additional evidence and found no abuse of discretion, stating, "The decision to reopen the record for the production of additional evidence, after all parties have rested, is one within the sound discretion of the trial court and will not be disturbed on appeal unless it is an abuse of discretion."

While we recognize the general authority of the trial court to reopen the record for taking of additional evidence in certain limited circumstances, here the trial court abused its discretion. As stated earlier, Olympia did not claim lost royalties but claimed that Aspect's failure to timely provide field data caused Olympia delay damages of $11,360,089. The trial court, on its own motion, issued an Order to have the parties stipulate to the net value of royalties received by Olympia from four arbitrarily assigned wells drilled on the NSPA acreage during a different arbitrary time period to mimic the royalty deficit span it had created. Absent such a stipulation, the trial court would appoint an expert to go through records that may not have been produced in discovery, and, by the trial court's own

29

admission, were not in the trial record. The expert would then arrive at a damage figure based on the new information. No formal procedure was set up to allow the parties to call or cross-examine witnesses on the issue.

Aspect objected, and the trial court, *sua sponte*, then issued a post-trial show cause hearing on the issue. After the unusual post-trial hearing, the trial court issued an Order which required Olympia to provide the necessary documentation for a determination of the actual royalties received by Olympia for the four listed wells chosen by the trial court during the time period in question. The parties were to jointly report to the trial court whether they had reached an agreement on the actual amount of net royalties received by Olympia from these arbitrarily selected wells during the arbitrary time period selected by the trial court. If the parties were unable to reach an agreement, once again subject to Aspect's objections, the trial court expressed its intention to appoint an independent expert to make the determination.

Aspect, over its strong objection to the entire procedure, chose the stipulation, and, in a document filed on July 25, 2012, agreed that $7,120,140 was the amount Olympia and its affiliates received from the four allegedly representative wells during the measurement period. The trial court then based its award for loss of royalties on the amount of the net royalties received by Olympia from the four wells during the arbitrary time period selected by the trial court based on the arbitrary royalty deficit span the trial court had also selected on its own. The trial court awarded this exact amount to Olympia as loss of royalties based on the trial court's finding that this sum was the amount Olympia could have earned had Aspect timely turned over the field data from the 3-D seismic survey it had performed under the NSPA.

As authority for this award, the trial court relied on La.Civ.Code art. 1995 and *Breaux*, 163 So.2d 406. La.Civ.Code art. 1995 has also been cited as a basis for the determination of damages involving a mineral case by this court in *Amoco Prod. Co. v. Texaco*, 02-240 (La.App 3 Cir. 1/29/03), 838 So.2d 821, *writs denied,* 03-1102, 03-1104 (La. 6/6/03), 845 So.2d 1096. *Amoco* involved the breach of a reassignment clause of a mineral sublease by an exploration company subsidiary and its corporate parent. A panel of this court affirmed the jury's verdict of $30,000,000 and quoted La.Civ.Code art. 1995, which provides: "Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived." The plain language of this article requires that damages include whatever profit the plaintiff may have lost due to the inaction of the defendant. *Amoco,* 838 So.2d at 837.

*Breaux* and *Amoco* are distinguishable from the case at bar. Both involved damages based on a mineral lease and not a seismic permit, and both were decided on evidence already in the record.

In appealing the trial court's $7,120,140 award for loss of royalties, Aspect argues that Olympia did not sue for, claim, or offer any evidence to prove that it had lost royalties. On this issue, we agree with Aspect that the evidence at trial showed EPMI was in disarray during the period from 2001-2004, the royalty deficit span the trial court created. EPMI was in no position to try to develop the prospect due to its serious unrelated economic problems during this same time period. EPMI did not even request the field data until 2004, some two and one-half years after the NSPA expired. EPMI admitted that it was not in a position to act on the data had it been produced earlier.

31

In January 2004, within a short period of time after Olympia merged with El Paso, Olympia subleased its acreage to Wiser Oil, who immediately went about acquiring the seismic data El Paso/Olympia already had, and began to develop the prospect. The claim that Olympia was harmed due to the failure of Aspect/Kerr-McGee to deliver the field data sooner simply was not proven by the evidence in the record, even if such damages could theoretically be awarded under La.Civ.Code art. 1995.

The trial court's reliance on Article 1995 and *Breaux*, 163 So.2d 406, for this element of damages, is misplaced. In fact, *Breaux* reaffirms Louisiana's jurisprudence that lost royalty claims cannot ordinarily be made when the minerals are still in the ground:

> It is well settled in Louisiana that oil and gas in place are fugitive minerals which are not subject to absolute ownership as specific things apart from the soil. The owner of land does not own the fugitive oil or gas beneath it so as to have the right to follow it after it has left his land, but he does have the right to drill on his land and to become the owner of such oil and gas as he may thereby draw through the soil and bring into his possession.

*Breaux*, 163 So.2d at 409 (citations omitted).

In the Sabine Project Agreement, Olympia subleased all of the acreage in question to Wiser Oil for over $10,000,000 in January 2004. Pursuant to the sublease, the WIOs have been active in drilling the prospect and have paid, and continue to pay, significant royalties to Olympia.

With this background in mind, the trial court's decision to reopen the evidence with no provision for calling witnesses or cross-examination and to have the parties "stipulate," failing which it would appoint an expert to calculate Olympia's loss of royalties, cannot be upheld. The royalty deficit span applied by the trial court to the production of four wells arbitrarily selected during a much

later time period is speculation compounded at best. At worst, at least according to Aspect, the trial court had become an advocate for Olympia in awarding an element of damages not permitted by Louisiana law, not claimed by Olympia, and not established by Olympia at trial by a reasonable preponderance of the evidence.

Though we do not agree that the trial court abandoned its judicial role in favor of being an activist or advocate for Olympia, we do agree that the damages awarded for loss of royalties during the royalty deficit span are speculative and not proven by competent evidence in the record at the close of the trial. As indicated earlier, the evidence at trial established that EPMI was not in a position to develop the prospect during the time period in question, even if it would have had the field data. The minerals owned by Olympia were still in the ground and were not drained or destroyed. To the contrary, the minerals have been and are being produced by the WIOs. To force Aspect to pay for the same royalties based on a breach of a seismic contract because the minerals were not extracted earlier is not only speculative and not supported by the evidence at trial, but would also amount to a windfall for Olympia.

We reverse the trial court's award of $7,120,140 for loss of royalties. Olympia did not claim or prove loss of royalties based on the evidence in the record at the trial's conclusion. The trial court's decision to re-open the evidence and creatively calculate an amount for loss of royalties is an abuse of discretion.

### Wiser Oil and the WIOs' Assignment of Error 1: Dismissal of Claims Based on the Provisions of the NSPA

The trial court refers to the plaintiffs who were not parties to the NSPA, Wiser Oil and the WIOs, as "non-contracting parties." As previously indicated, Wiser Oil acquired subleases from Olympia on the NSPA acreage and then sold

participation to others, i.e., the WIOs. These non-contracting parties also seek losses against Aspect arising from the violations of the NSPA.

The Civil Code provides a remedy for a non-contracting third party when a contracting party stipulates benefit in the contract to a third party. La.Civ.Code art. 1978. This stipulated benefit is referred to as a *stipulation pour autrui.* See La.Civ.Code arts. 1978-1982. As non-contracting parties to the NSPA, Wiser Oil and the WIOs were required to convince the trial court that the provisions of the NSPA met the requirements outlined in the supreme court case of *Joseph v. Hospital Service District No. 2 of the Parish of St. Mary*, 05-2364 (La. 10/15/06), 939 So.2d 1206. The three part test of *Joseph* requires that: "1) the stipulation for a third party is manifestly clear; 2) there is certainty as to the benefit provided the third party; and 3) the benefit is not a mere incident of the contract." *Id.* at 1212.

The trial court was not convinced that the provisions of the NSPA met any one of the three requirements necessary under *Joseph*. The trial court held that the non-contracting parties could not seek recovery of damages from Aspect for its failure to timely produce the field data to Olympia.

The trial court also found that the provisions of the NSPA itself were the death knell to the non-contracting parties because the NSPA did not contain any mention of any other beneficiary besides the contracting parties. In addition, the NSPA contained no language which suggested that one of the causes or considerations of the contract was a desire to confer a benefit on a third party. *See Scaffidi and Chetta Entm't v. Univ. of New Orleans Found.*, 04-1046 (La.App. 5 Cir. 2/15/05), 898 So.2d 491, *writ denied*, 05-0748 (La. 5/6/05), 901 So.2d 1102.

Louisiana Civil Code Article 2046 provides: "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation

34

may be made in search of the parties' intent." Paragraph 5.1 of the NSPA clearly provides that no benefits are to be conferred on any non-contracting party:

> 5.1    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and, except as otherwise prohibited, their respective successors and assigns; and except as otherwise stated herein, nothing contained in this Agreement, or implied herein, is intended to confer upon any other person or entity any benefits, rights or remedies.    The parties agree that this Agreement may not be assigned, in whole or in part, without the express written consent of the other party, which shall not be unreasonably withheld.

The second sentence of Paragraph 5.1 of the NSPA also forecloses the non-contracting parties' argument that the Master Sublease Agreement operated as an assignment under the NSPA of real rights in the property.    The language in Paragraph 5.1 clearly prohibits assignment "in whole or in part" without the consent of the other party, and the NSPA ended by its own terms long before the confection of the Master Sublease Agreement between the non-contracting parties and Olympia.

Finally, the trial court correctly concluded that under Louisiana law a *stipulation pour autrui* is not presumed. The third party claiming its existence has the burden of proof. *Dugas v. Thompson*, 11-178 (La.App. 4 Cir. 6/29/11), 71 So.3d 1059. The non-contracting parties, Wiser Oil and the WIOs, failed to carry their burden, and the trial court correctly found no legal basis for their claims. We affirm the trial court's ruling on this issue.

**Aspect's Assignment of Error H:  Dismissal of Aspect's Reconventional Demand**

In response to the claims of the plaintiffs, Aspect and Kerr-McGee filed a reconventional demand, into which Aspect Energy intervened.    Due to the settlement and withdrawal of Kerr-McGee from the litigation, only the claims of Aspect and Aspect Energy remained pending at trial.    The Aspect entities contend

that Olympia breached the general provisions of the NSPA and that Olympia, Wiser Oil, and the WIOs violated the provisions of the Seismic Data License Agreement.

Having already concluded that Olympia was entitled to dissolution of the NSPA due to Aspect's failure to perform its obligations under the Agreement, the trial court found that Olympia could not have breached a dissolved contract. The trial court also found that Olympia's predecessor, El Paso, had fully performed all of its obligations under the NSPA.

As to the Seismic Data License Agreement, the trial court further found that the seismic license, appended to the NSPA as Exhibit D, was not a separate contract from the NSPA. The trial court cited the case of *JTS Realty Corp. v. City of Baton Rouge*, 499 So.2d 274 (La.App. 1 Cir. 1986), *writ denied*, 503 So.2d 19 (La.1987), in support of its finding that the Seismic Data License Agreement was not a stand-alone contract. The trial court noted *JTS Realty Corp.* presented a similar factual situation where there was a principal contract to build an office/hotel development, which included five additional contracts associated with the principal contract. The *JTS Realty Corp.* court determined that:

> Although the major contract as we have seen is called the Lease and Development Agreement, and the other contracts ancillary contracts, the agreements that are before us are all separate facets of a single whole, as each contract constitutes part of the cause or consideration for each other contract. That being the case, we hold the separate contracts to constitute one single contract or agreement, each by its own terms dependent on the existence of the others.

*Id.* at 278.

Based on its determination that the Seismic Data License Agreement was dependent on the principal NSPA, and that the dissolution of that agreement was retroactive, the trial court correctly found: "the effects of the license were also

dissolved and any restrictions on the use of the data 'give' to Olympia were cancelled." Accordingly, the trial court found the reconventional demand urged by Aspect and Aspect Energy had no basis and was dismissed with prejudice against all defendants. We affirm that ruling.

***Wiser Oil and WIOs' Assignment of Error 4: The Court's Assessment of 25% of the Court Costs against Wiser Oil and the WIOs***

The trial court assessed the costs of the proceedings as follows: 75% to Aspect and Aspect Energy and 25% to the non-contracting plaintiffs, i.e., the WIOs.

The WIOs have appealed the trial court's assessment against them of 25% of the costs. However, pursuant to La.Code Civ.P. art.1920, "Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable." We have affirmed the trial court's dismissal of the WIOs' claims as non-contracting parties against Aspect. We have also affirmed the trial court's dismissal of the claims of Aspect and Aspect Energy in their reconventional demand against Olympia and the WIOs. Accordingly, based on the discretion afforded the trial court in a determination of costs, we find no abuse of discretion by the trial court and affirm.

***Olympia's Assignment of Error 2 and Wiser Oil and the WIOs' Assignment of Error 3: Attorney Fees for Defense of LUTSA/LUTPA Claims Made by Aspect***

Olympia and the WIOs seek an award of attorney fees for defending the reconventional demand of Aspect and Aspect Energy. The Aspect entities sought damages under the Louisiana Uniform Trade Secrets Act (LUTSA) and the Louisiana Unfair Trade Practices Act (LUTPA). Those statutes provide that the prevailing party in such a claim, in this case Olympia, may be awarded attorney fees. La.R.S. 51:1434 and La.R.S. 51:1409. Olympia and the WIOs' request for

attorney fees is based on the trial court's finding of bad faith by Aspect in the performance of their obligations under the NSPA.

After a review of the record, it appears that Olympia neither specifically plead the issue of attorney fees for defending the LUTSA and LUTPA claims, nor raised the issue in the trial court after the trial court issued its Reasons for Judgment and prior to rendition of the Final Judgment. Since this request for attorney fees is raised for the first time on appeal, it is barred from our review. *Segura v. Frank*, 93-1271(La. 1/14/94), 630 So. 2d 714, *cert denied*, 511 U.S. 1142, 114 S. Ct. 2165 (1994).

### Olympia's Assignment of Error 3 and Wiser Oil and WIOs' Assignment of Error 2: Inclusion of Aspect Energy in the Judgment

On July 23, 2012, Olympia submitted its Proposed Final Judgment. It sought to impose judgment in favor of Olympia against Aspect Energy, as well as Aspect.

Olympia and the WIOs urge that testimony presented at trial supports their conclusion that Aspect and Aspect Energy are a single business entity, and, thus, Aspect Energy should be included in the judgment rendered in favor of Olympia against Aspect.

In addition, Olympia and the WIOs claim the intervention of Aspect Energy in Aspect's reconventional demand provided a basis to transform Aspect Energy into a defendant.

Aspect and Aspect Energy filed a response and objected on the basis that Aspect Energy was not a defendant in this lawsuit and not a party to the NSPA. Further, both Aspect and Aspect Energy claimed that no party has asserted any

38

claim against Aspect Energy, and no party ever filed any pleading or argument that the single enterprise theory should apply to Aspect Energy.

The case of *Socorro v. City of New Orleans*, 579 So.2d 931 (La.1991), cited by Olympia in its response to Aspect's objections, is distinguishable on its facts. In *Socorro*, the defendant at issue was an insurance company named as DEF Insurance Company in plaintiff's petition. The actual insurance company, Angelina Casualty Company, filed a motion for summary judgment, but did not dispute it was the correct insurance carrier. The supreme court found that although the plaintiff's petition was never amended to name Angelina, by filing the summary judgment, Angelina had subjected itself to the court's jurisdiction and the court could render judgment as if Angelina were a properly named defendant.

In the Final Judgment, the trial court added Aspect Energy in handwriting and initialed the addition to section two of the judgment requiring the return of the field data to Olympia. By including Aspect Energy, the trial court recognized the connection between the two Aspect entities only with respect to the possession of the field data.

However, the portion of the judgment in section one, which included the damages owed to Olympia, was only rendered against Aspect. Aspect was the only Aspect entity sued by Olympia and the WIOs. Louisiana Code of Civil Procedure article 1201(A) requires, in pertinent part: "Citation and service thereof are essential in all civil actions . . . . Without them all proceedings are absolutely null."

The law does not permit a judgment to be rendered against a non-named party. Thus, this assignment of error urged by Olympia and the WIOs is without merit.

*Olympia's Assignment of Error 4: Attorney Fees for Appeal*

Olympia also asks for attorney fees for this appeal. Louisiana Code of Civil Procedure Article 2164 provides:

> The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal. The court may award damages, including attorney fees, for frivolous appeal or application for writs, and may tax the costs of the lower or appellate court, or any part thereof, against any party to the suit, as in its judgment may be considered equitable.

There is no basis to find that this appeal was frivolous, and we do not find any other basis to award attorney fees to Olympia in connection with this appeal. This case presented a complex set of circumstances which were highly contested between all parties and does not represent the type of appeal where an award of attorney fees to Olympia is merited under the circumstances of this case.

## CONCLUSION

For the forgoing reasons, the Judgment of the trial court is affirmed, except for the award of $7,120,140 for lost royalties, which we reverse. Costs for this appeal are assessed 25% to Plaintiffs/Appellees, Olympia Minerals, LLC and Olympia Minerals Leasing, LLC, 50% to Defendants/Appellants, Aspect Resources, LLC and Aspect Energy, LLC and 25% to Plaintiffs/Appellees Wiser Oil Company, Forest Oil Corporation, Bass Partnership, Cinco Natural Resources, Direct Energy Partner, Ltd., Orr Exploration, Ltd., Hayes Exploration, Ltd., Tedora Exploration, Ltd., and Sabine Development Company, LLC.

**AFFIRMED IN PART AND REVERSED IN PART.**